IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| TONI C. WORKS, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. RDB 10-1284 |
| MICHAEL J. ASTRUE, Commissioner, U.S. Social Security Administration, | * | |
| | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiff Toni C. Works ("Works") brings the pending action against her former employer, Defendant Social Security Administration ("SSA") for (1) disability discrimination, (2) failure to accommodate, and (3) retaliation. The parties' submissions have been reviewed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2010). For the reasons that follow, Defendant SSA's Motion to Dismiss, or in the alternative, for Summary Judgment (ECF No. 7) is GRANTED. Specifically, all claims other than Works's termination are dismissed for failure to exhaust administrative remedies, and summary judgment is granted with respect to Works's claims arising out of her termination.

### BACKGROUND

This Court reviews the facts relating to this claim in the light most favorable to the plaintiff. *See, e.g., Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).

1

From August 26, 2002 until August 8, 2003, Defendant the Social Security Administration employed Plaintiff Toni Works as a probationary employee. Works alleges that she was terminated in 2003 because of her health issues, namely her seizure disorder, though the SSA argues that it terminated her because of performance problems.

A.  **Works's Injury and Disability Benefits from 1985-2002**

In 1984, Works began serving as an aircraft electrician for the United States Air Force. At some point in 1985, Works suffered a fall that resulted in severe brain trauma that required surgery, and left her with migraine headaches and a seizure disorder. In 1989, the Navy honorably discharged her. From November 1989 until September 1991, Works worked as a biomedical equipment technician. In 1992, as a result of her seizure disorder, Works stopped working and applied for and received 100% disability compensation from the SSA, which found her to be totally disabled. Soon thereafter, Works applied for and received 100% disability benefits from the United States Department of Veterans Affairs ("VA"), who also found that she was completely disabled. From 1992 to 2002, Works was not employed in any paid position.

B.  **Works's Probationary Employment from August 2002-December 2002**

On August 26, 2002, Works began working at SSA as a probationary employee, which meant she could work for the SSA on a trial basis for one year without having to discontinue her disability benefits to demonstrate whether she could successfully perform the job and be retained on a permanent basis. Works was employed by the SSA as a Management Assistant in the Office of Management Operations ("OMO"). As a Management Assistant, Works was required to maintain and compile data regarding work flow charts and staffing levels, make routine calculations regarding staff hours and employee workload, provide charts and graphs of the data

collected for analysts, and assist with other duties that were assigned to her. At OMO, Works's supervisors were Marjorie Warner ("Warner"), a Branch Manager, and William Johnson-Bey ("Johnson-Bey"), who was Warner's Deputy Branch Manager.

From the start of her employment, Works had problems completing the responsibilities of her position. According to employees at SSA, Works was repeatedly given assignments that she failed to properly perform. For example, in October 2002, Johnson-Bey gave Works a project requiring her to enter budget data. When it became apparent that Works could not complete the project because she could not do the basic arithmetic required to total up the budget items, another SSA employee had to take over the assignment. Later that same month, Works received another assignment requiring her to sort training forms by employees' Social Security Numbers. Works was not able to complete this project, and a different SSA employee had to re-do the project.

Works supervisors also had immediate concerns about her conduct in the workplace. Notably, at her deposition, Works stated that she knew some of her co-workers and supervisors at SSA were unhappy with her performance from the beginning of her employment. Works was observed stepping away from her desk for long periods of time, taking personal phone calls during the workday, and failing to properly sign in and out on her timesheets. Works reported that from the time she began her probationary position until January 2003, she had no problems with her seizures or diabetes. Thus, during the first five months on the job, there is no indication that Works appeared to have any health problems.

    **C.**    **Works's Seizures and Leave Requests from January 2003 through February 2003**

From late December 2002 into January 2003, Works's VA doctors began putting her on new medications. Though they initially did not cause her problems, Works suffered a seizure in early January 2003 while she was at home. Works then provided the SSA documentation from the VA stating that she would not be able to work from January 7 until January 20, 2003. Since Works had not accrued enough annual or sick leave to cover her absence by that time, she requested advanced sick leave from her supervisor, Warner, who immediately approved her request.

Works was cleared to return to work with no restrictions on January 20, 2003. There is no evidence that Works requested any accommodation from Warner or Johnson-Bey or indicated that her medications were affecting her workplace performance at this time. However, on February 13, 2003, Works had a grand mal seizure at work. As a result, Works requested and received approval to take medical leave from work from February 13 through 21, 2003. Warner and Johnson-Bey then arranged for an SSA nurse to give a presentation to the staff about how to react and render aid in case Works experienced another seizure in the office in the future.

On February 24, 2003, Works was cleared to return to work with no restrictions. Works did not return that day or the next day, however, purportedly because she had an OB-GYN appointment that was unrelated to her seizure disorder, and because she injured herself on one of those days when she fell on ice. Works never provided documentation of these absences, therefore she was considered on absent without leave status.

**D.**  **Works's Evaluation and Performance from March 2003 to May 2003**

As a probationary employee, Works received a mid-year performance review to assist in determining whether she should be retained after her year of employment. Thus, on March 19, 2003, Johnson-Bey met with Works and explained to her that she had received a significant

4

amount of negative comments regarding her performance and abilities. Though Works was inexplicably told that her performance was "basically satisfactory," she was also told that she needed to improve her work habits.

Works's supervisors did not notice any improvement in her performance in the following months. Instead, Works continued to commit glaring errors. For example, Works gave a presentation on a database project that showed she had not done as much work on the project as she had indicated. Works then attempted to take credit for work on this project that had been done by a coworker. Works also refused to do typing pool work that all management assistants were supposed to do for two hours a day. Nonetheless, Works continued to take large amounts of leave, most of which did not relate to her seizure disorder but instead had to do with sinus problems or housing issues.

### E. Works's Termination

On June 23, 2003, Johnson-Bey gave Works a letter explaining that her supervisors felt her performance and conduct were only getting worse, and that "substantial improvement is needed." On July 18, 2003, Works asked Warner if she would be retained after her probationary period. Warner replied that if she had to make a decision that day, Works would not be retained. Warner subsequently asked officials in the human resources department to draft a termination notice for Works. After this conversation, on July 25, 2003, Works appealed to Warner and Johnson-Bey to reconsider her termination. In doing so, Works presented them with a banker's box containing reams of paper that she claimed was a printout of a database that she had coded. Warner and Johnson-Bey realized upon closer inspection, though, that the box contained two pages of computer code that were photocopied to make it appear as if the box contained

computer code Works wrote. When they confronted Works, she began crying and explained that she was having personal problems.[1] Works was given a notice of proposed removal later that day stating that her termination would be effective August 8, 2003.

When Works returned to work the following Monday, July 28, 2003, she asked Warner to reassign her to a different position. Warner spoke with one of her supervisors, who determined that Works should not be reassigned since she had already been given notice of her termination.

    **F.**    **EEO Proceedings**

On July 22, 2003, Works contacted an Equal Employment Opportunity counselor about her claims that she had been discriminated against because of her race, age, epilepsy and diabetes. The Equal Employment Opportunity Commission conducted an investigation, during which Works submitted an affidavit stating that she never expressly asked for a reasonable accommodation, but instead that she was "asking the [SSA] to forgive my absences based on my disability as an accommodation."

Works then requested a hearing on her claims before an Administrative Law Judge. This hearing took place on four different dates in August 2006. During this hearing, Works admitted to making false statements in her affidavit, such as submitting an EEO declaration indicating that she had not been notified that her performance was unsatisfactory until her termination. The ALJ ruled in favor of the SSA, finding that the only reasonable accommodation Works requested was for leave and for reassignment. Regarding the first finding, the ALJ found that the SSA had granted all of Works's leave requests related to her seizure disorder, and that there was no evidence that her supervisors discriminated against her as a result of her taking this leave.

---

[1] In her Reply, Works does not dispute that this incident took place.

Regarding the second finding, the ALJ held that the reassignment Works requested did not require accommodation because she did not request a reassignment until after she was given notice of her termination. The ALJ concluded that Works had not demonstrated that her termination was the result of discrimination, and instead that the SSA had a legitimate, non-discriminatory reason for its actions.

Works appealed the ALJ's decision to the Equal Employment Opportunity Commission ("EEOC"). The EEOC affirmed the ALJ's decision on February 19, 2010. On May 21, 2010, Works subsequently filed the pending Complaint in this Court. The SSA moves to dismiss, or in the alternative, moves for summary judgment on Works's claims, arguing that she has failed to exhaust her administrative remedies on some claims, and that the remaining claims fail as a matter of law.

## STANDARD OF REVIEW

This Court must analyze those claims that the Social Security Administration moves to dismiss for failure to exhaust administrative remedies under Rule 12(b)(6) of the Federal Rules of Civil Procedure, which authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted; therefore, a Rule 12(b)(6) motion tests the legal sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). Under Federal Rule of Civil Procedure 8(a)(2), a plaintiff is required to plead "a short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of this requirement is to "to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation and internal quotations omitted). Consequently, "a formulaic recitation of the elements of a cause of action will not do." *Id.*

(citation omitted). Similarly, "an unadorned, the-defendant-unlawfully-harmed-me accusation" is insufficient. *Ashcroft v. Iqbal*, --- U.S. ----, 129 S.Ct. 1937, 1949 (2009). Rather, to withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," meaning the court could draw "the reasonable inference that the defendant is liable for the conduct alleged." *Id.* (internal quotations and citation omitted).

This Court must analyze those claims for which the Social Security Administration moves for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, which provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249.

In undertaking this inquiry, this Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, this Court must also abide by its affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993). If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment must be granted. *Anderson*, 477 U.S. at 249-50. On

8

the other hand, a party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999). This Court has previously explained that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citations omitted).

## ANALYSIS

Works brings three claims under the Rehabilitation Act: (1) discrimination based upon her disability, (2) failure to accommodate, and (3) retaliation. SSA argues that all of Works's claims except those related to her August 2003 termination should be dismissed for failure to exhaust administrative remedies, and that summary judgment should be granted on the remaining claims.

**I.      Exhaustion of Administrative Remedies**

Before a federal civilian employee may file suit under the Rehabilitation Act, she must first exhaust her administrative remedies. *Medlock v. Rumsfeld*, 336 F. Supp. 2d 452, 462 (D. Md. 2002). Claims brought under the Rehabilitation Act are also governed by the exhaustion requirements and filing procedures applicable to Title VII claims against federal employers. 29 U.S.C. § 794a(a)(1); 29 C.F.R. § 1614.103(a). Prior to filing a charge of discrimination with the EEOC, a federal civilian employee has forty-five days to initiate contact with an EEO counselor after the occurrence of an employment action or matter that she believes to be discriminatory. Thus, "a district court must dismiss an employment discrimination claim if the plaintiff fails to seek EEO counseling within the prescribed time period." *Emmert v. Runyon*, No. 98-CV-2027,

1999 WL 253632, at *2-6 (4th Cir. Apr. 29, 1999) (affirming dismissal of Rehabilitation Act claims where plaintiff failed to make timely contact with EEO counselor); *see also Kim v. Potter*, No. 09-2973, 2010 WL 2253656, at *6 (D. Md. June 2, 2010) (dismissing Rehabilitation Act claims where plaintiff did not make contact with the EEOC representative within forty-five days of the adverse action).

In this case, Works first contacted an Equal Employment Opportunity counselor on July 22, 2003. Therefore, Works cannot bring any claims based upon allegedly adverse actions that took place forty-five days earlier, i.e. before June 7, 2003. As a result, Works's claims based upon her leave requests in 2002 and 2003, which were all made prior to this date, *see* Compl. ¶¶ 2, 53-66, 116-19, and the SSA's alleged failure to engage in interactive process prior to June 7, 2003, Compl. ¶¶ 3, 117, are time-barred. The only adverse action for which Works sufficiently exhausted her remedies was her termination, as she received notice of her termination on July 25, 2003. Accordingly, to the extent Works brings forth any claims other than her termination, such claims are dismissed for failure to exhaust administrative remedies.[2]

## II.    Disability Discrimination (Count I)

Works claims that she was discriminated against based upon her disability when the SSA terminated her. To establish discrimination based on her disability under the Rehabilitation Act, Works must demonstrate that she: (1) is an individual with a disability within the meaning of the

---

[2] In her Opposition brief, Works argues that the SSA waived its exhaustion argument during the administrative process. As the administrative decision makes clear, though, the SSA explicitly raised this issue at the earlier hearing and therefore did not waive this argument. Furthermore, Works's argument that her failure to exhaust can be excused under the continuing violations doctrine is unavailing, as the United States Supreme Court has expressly held that this doctrine is inapplicable to discrete claims of discrimination. *See Amtrak v. Morgan*, 536 U.S. 101, 110-14 (2002).

ADA; (2) is otherwise qualified for the job in question; and (3) suffered an adverse employment action solely because of the disability. *Edmonson v. Potter*, 118 Fed. Appx. 726, 728 (4th Cir. 2004).

### 1. Disability

SSA concedes that Works is disabled due to her seizure disorder, but argues that summary judgment should be granted to the extent she bases her claim on having diabetes. *See* Compl. ¶¶ 2, 25-27. The ADA defines "disability" as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1).

Works has not established that she is disabled under the ADA because of her diabetes. First, she has admitted that her diabetes did not affect her work while employed by SSA. Second, there is no evidence that Works had a record of being a diabetic. Third, Works has not shown that anyone at the SSA regarded her as being a diabetic. Finally, there is no record that Works ever sought leave for medical treatment relating to her diabetes. Thus, Works has not established that she is disabled due to her diabetes. Accordingly, to the extent any of Works's claims are based upon her diabetes, summary judgment is granted in favor of the SSA.

### 2. Qualified Individual with a Disability

With respect to Works's seizure disorder, she must still demonstrate that she was otherwise qualified for her position. In order to be a qualified individual with a disability under the Rehabilitation Act, Works must show that she was capable of performing "the essential functions of the employment position." 42 U.S.C. § 12111(8); *see also Constantine v. Rectors &*

*Visitors of George Mason Univ.*, 411 F.3d 474, 498 n.17 (4th Cir. 2005). Essential functions of a job are those "that bear more than a marginal relationship to the job at issue." *Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 213 (4th Cir. 1994).

In this case, the SSA has brought forth an abundance of evidence demonstrating that Works could not perform the essential functions of her position. As an initial matter, Works was a probationary employee who received 100% disability benefits during her employment. Works was aware during her time at the SSA that she was working in a "trial period" pursuant to 32 U.S.C. § 422(c) to see whether she was capable of performing the functions of the job. From the beginning, it is clear that Works had problems completing relatively simple assignments requiring her to use basic arithmetic, which was an explicit requirement of her position. Works was also unable to work with computers and databases, which were similarly an unambiguous prerequisite for her position. Most egregiously, when Works made a last attempt to save her job by showing she was able to work with databases, she provided a box of documents that she said was a printout of code she created, but in fact was a box of the same two pages she had repeatedly copied. Thus, there is more than sufficient evidence in the record that shows that Works was incapable of performing the essential elements of her position as a management assistant. *See Shin v. Univ. of Maryland Med. Sys. Corp.*, 369 Fed. Appx. 472, 480-81 (4th Cir. 2010) (affirming grant of summary judgment to employer where plaintiff was found to be not qualified because his work was "unsatisfactory" and he had been cited for being "highly inefficient"). Accordingly, this Court grants summary judgment to the SSA on Works's disability discrimination claim (Count I).

### III. Failure to Accommodate (Count II)

Works claims that the SSA failed to accommodate her disability when it terminated her after it granted her requests for leave and refused her request for reassignment. To establish a prima facie case for failure to accommodate under the Rehabilitation Act, an employee must show: (1) she was an individual with a disability within the meaning of the ADA; (2) the employer had notice of her disability; (3) she could perform the essential functions of the position with reasonable accommodation; and (4) the employer refused to make such accommodations. *Rhoads v. FDIC*, 257 F.3d 373, 387 n.11 (4th Cir. 2001) As the United States Court of Appeals for the Fourth Circuit has explained, "the burden to provide notice is not an onerous one," but an employee must inform the employer of *both* her disability and her need for accommodations for that disability. *Schneider v. Giant of Maryland*, *LLC*, 389 Fed. Appx. 263, 270 (4th Cir. July 26, 2010) (citing *E.E.O.C. v. Federal Express Corp.*, 513 F.3d 360, 369 (4th Cir. 2008)).

First, as explained above, Works has not shown that she is a qualified individual with a disability under the Rehabilitation Act. Second, Works has not provided any evidence establishing that her supervisors were on notice that she needed an accommodation. Although Works's supervisors were well aware of her seizure disorder, the only accommodation Works sought was leave, almost all of which was immediately granted. Notably, each time Works returned to work after taking leave she was cleared to work with no restrictions. Thus, Works's supervisors were never put on notice that Works needed an accommodation outside of the leave that she requested.[3] Works also claims that she sought reassignment as an accommodation.

---

[3] Works argues that, although the SSA granted her leave requests, "this accommodation proved to be worthless because Defendant terminated Ms. Works in retaliation for requesting and using it." Opp'n at 49. This statement does not constitute a failure to accommodate claim, but will

However, Works did not request reassignment until after she was given notice of her termination. Works's claim for an accommodation therefore fails because she had already been given notice of her termination before asking to be reassigned, and an employer is not required to provide an accommodation at that point. *Scott v. Memorial Sloan-Kettering Cancer Center*, 190 F.Supp.2d 590, 595 (S.D.N.Y. 2002) (holding that requests for accommodations must be made prior to termination); *Brown v. The Pension Boards*, 488 F. Supp. 2d 395, 407 (S.D.N.Y. 2007) (same). Accordingly, Works has not produced any evidence to support her claim that the Social Security Administration had notice that Works required an accommodation for her disability.

Third, Works has not established that she could perform the essential functions of her job even with a reasonable accommodation. As this Court has explained, Works could not perform the essential functions of her job without a reasonable accommodation. Since Works did not ask for any reasonable accommodation other than leave, she cannot show that she could perform her job with some other, unexpressed accommodation. Accordingly, this Court grants summary judgment to the SSA on Works's failure to accommodate claim (Count II).

## IV. Retaliation Claim (Count III)

In Count III, Works claims that she was retaliated against for engaging in protected activity, namely requesting leave and reassignment. To state a *prima facie* case of retaliation, a plaintiff must show that (1) she engaged in a protected activity; (2) the employer acted adversely against her; and (3) the protected activity was causally connected to the adverse action. *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007). As explained in Section I, the only adverse action for which Works has properly exhausted her administrative remedies is her July

---

instead be addressed in Section IV, where this Court analyses Works's retaliation claim.

25, 2003 termination. Thus, assuming that Works's requests for leave and reassignment constituted protected activity, this Court must only determine whether the SSA terminated Works in response to her requests for leave and reassignment.

Works argues that there must be a causal connection between her requests for leave and her termination given the short period of time between when she took medical leave for one of her seizure episodes, on July 15 and 16, 2003, and when she was told she would be terminated, on July 18, 2003. Works does not provide any further evidence of a causal connection other than this short time period, however. Notably, the SSA immediately grated Works's request for leave on these dates. Thus, to accept Work's argument this Court would have to conclude that the SSA retaliated against Works for taking leave that it explicitly allowed her in the first place. Additionally, the SSA has provided a plethora of evidence regarding Works's shortcomings as an employee that were unrelated to her taking leave, and there is no dispute that the SSA granted Works leave on numerous prior occasions with no hesitation. As a result, this Court finds that there is no causal connection between Works's requests for leave and her termination.

Works also argues that the temporal proximity between her request for reassignment and her termination is evidence of a causal connection. Since Works was terminated before she requested reassignment, though, it is not possible that the SSA could have retaliated against her *before* the alleged protected activity. Thus, Works has not established any causal connection between her termination and her requests for leave or reassignment. Accordingly, this Court grants summary judgment to the SSA on Works's retaliation claim (Count III).

CONCLUSION

For the reasons stated above, Defendant SSA's Motion to Dismiss, or in the Alternative, for Summary Judgment (ECF No. 7) is GRANTED. Specifically, all claims other than Works's termination are dismissed for failure to exhaust administrative remedies, and summary judgment is granted with respect to Works's claims arising out of her termination.

A separate Order follows.

Dated:	March 29, 2011	/s/_____
	Richard D. Bennett
	United States District Judge