IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TONI WORKS,                               *

    Plaintiff,                           *

      v.                                *          Civil Action No. RDB-10-1284

CAROLYN COLVIN, Acting                    *
Commissioner, U.S. Social Security
Administration                            *

    Defendant.                           *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OPINION

Plaintiff Toni Works ("Works" or "Plaintiff") brings this action against Defendant United States Social Security Administration ("SSA" or "Defendant"), alleging employment discrimination under the Rehabilitation Act, 29 U.S.C. §§ 701 *et seq.* Specifically, Plaintiff asserts claims of (1) disability discrimination; (2) failure to accommodate; and (3) retaliation.[1] Discovery having now been completed, pending before this Court is Defendant's Motion for Summary Judgment (ECF No. 64). The parties' submissions have been reviewed and no

---

[1] In her Complaint, Plaintiff also raised various claims relating to alleged incidents that occurred before June 7, 2003. *See* Compl. ¶¶ 2, 53-66, 116-19, ECF No. 1. This Court dismissed these claims for failure to exhaust administrative remedies. Mem. Op., 10, ECF No. 27. Although the United States Court of Appeals for the Fourth Circuit vacated this Court's order to give Plaintiff the opportunity for further discovery, it noted that Works did not appeal the dismissal for failure to exhaust administrative remedies. *Works v. Colvin*, 519 F. App'x 176, 181 n.8 (4th Cir. 2013), ECF No. 37. As the United States Supreme Court confirmed in *Aro Manufacturing Co. v. Convertible Top Replacement Co.*, a plaintiff's failure to raise a claim on appeal precludes reconsideration of that claim on remand to the district court. 377 U.S. 476, 491 n.9 (1964). As Works abandoned these claims on appeal, she may not now argue for reconsideration before this Court. Thus, the only claims remaining on remand are those related to her July 25, 2003 termination.

hearing is necessary. *See* Local Rule 105.6 (D. Md. 2014).   For the reasons that follow,

Defendant Social Security Administration's Motion for Summary Judgment (ECF No. 64) is

GRANTED, Judgment is entered in its favor, and this case is to be CLOSED.

<u>BACKGROUND</u>

In ruling on a motion for summary judgment, this Court reviews the facts and all

reasonable inferences in the light most favorable to the nonmoving party.  *Scott v. Harris*, 550

U.S. 372, 378 (2007); *see also Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 433 (4th Cir.

2013).

Plaintiff Toni Works was employed by Defendant SSA as a Management Assistant

from August 26, 2002 until her termination on August 8, 2003. The SSA hired Works as a

probationary employee, a position that permitted her to "work for the SSA on a trial basis

for one year without having to discontinue her disability benefits to demonstrate whether

she could successfully perform the job and be retained on a permanent basis." Mem. Op., at

2. Works contends that the SSA terminated her on the basis of her seizure disability and

related medical concerns, thereby violating the protections of the Rehabilitation Act. The

SSA, however, counters that it discharged Works due to her well-documented performance

issues.

**A. 1985-2002: Plaintiff's Injury and Disability Benefits**

In 1985, Works, then an aircraft electrician in the United States Navy, suffered a fall

that resulted in severe brain trauma. *See* Pl.'s Compl., ¶¶ 15-17, ECF No. 1; *see also* Pl. Dep.

8:9-14, March 11, 2005, ECF No. 64-2 ("Pl. Dep. I"). Works's injury ultimately left her with migraine headaches and a seizure disorder. *Id.* She continued to work for the Navy until 1989, when she was honorably discharged. *Id.* After leaving the Navy, Plaintiff worked as a biomedical equipment technician for the King Drew Medical Center in Los Angeles, California. Pl. Dep. 31:1-3, April 9, 2014, ECF No. 64-3 ("Pl. Dep. III"). Works began to experience panic attack-related medical issues, which caused her to miss many days of work. Def.'s Mot. for Summ. J. Ex. 3, 2, ECF No. 64-4 (in which the attending doctor's Initial Psychiatric Evaluation explained that Works had used "458 sick hours and . . . all of her vacation and holiday time as well."); *see also* Pl. Dep. III 35:9-36:13. Plaintiff's supervisor therefore advised her that, although she performed at the level expected, her "attendance is simply not good enough to support keeping her in her position." Def.'s Mot. for Summ. J. Ex. 3, at 2.

On December 30, 1991, Works consequently applied to the SSA for comprehensive disability benefits. Def.'s Mot. for Summ. J. Ex. 4, ECF No. 64-5. The SSA certified her as totally disabled, and granted her one hundred percent disability benefits. Pl. Dep. 31:8-14, June 2, 2006, ECF No. 64-6 ("Pl. Dep. II"). Works also applied for and received disability benefits from the United States Department of Veterans Affairs ("VA"). Pl. Dep. II 15:9-18:11. Although Works initially received only thirty percent disability benefits, in August 2003 she applied for an increase in her benefits to one hundred percent. Pl. Dep. II 17:15, 23:10-24:3. The VA, after concluding that her disability was the result of a service-related injury, approved the increase. *Id.* From 1992 to 2002, Plaintiff did not work and continued to

received comprehensive disability benefits. During this period, she also began to experience debilitating seizures. Pl. Dep. I 46:17. The seizures, along with related medical issues, made it hard for Works to concentrate and affected her memory, among other side effects. Pl. Dep. III 80:12-86:2; *see also* Pl. Dep. I 51:6-52:22.

**B. August – December 2002: Plaintiff's Probationary Employment Begins**

In August 2002, the SSA hired Works as a Management Assistant. Pl. Dep. III 99:10; *see also* Pl. Aff. 2, ECF No. 64-12. Works was a probationary employee, thus she worked for the SSA on a one-year trial, during which she could continue to receive full disability benefits. Warner Aff. 2, ECF No. 64-13. She understood that, as a probationary employee, she had to demonstrate that she could perform at the level expected of a permanent employee. Pl. Dep. III 203:21; *see also* Def.'s Mot. for Summ. J. Ex. 19-C, 68:16, ECF No. 64-20 (Transcript of Hearing before Administrative Law Judge, Aug. 23, 2006).

As a Management Assistant, Works was expected to "maintain and compile data regarding workflow charts and staffing levels, make routine calculations regarding staff hours and employee workload, provide charts and graphs of the data collected for analysts," and related duties. Mem. in Supp. of Def.'s Mot. for Summ. J., 10 , ECF No. 64-1(citing Def.'s Mot. for Summ. J. Ex. 14, 1, ECF No. 64-15 (Position Description)). Works reported to Marjorie Warner ("Warner"), the Branch Chief of the Employee Development and Training Branch ("EDTB"). Pl. Aff. 2. Warner was assisted by Deputy Branch Chief William

Johnson-Bey ("Johnson-Bey"), and later Janet Edrington ("Edrington").[2] Warner Aff. 2; Edrington Dep. 9:3, March 27, 2014, ECF No. 64-16.

When Works first began her employment, she received extensive training in applicable software, time management, math, and other necessary skills. Def.'s Mot. for Summ. J. Ex. 19-A, 57:22, ECF No. 64-20 (Transcript of Hearing before Administrative Law Judge, Aug. 10, 2006). Warner also described to Works the expectations and obligations of the position. Def.'s Mot. for Summ. J. Ex. 19-C, at 72:12-73:21. Despite the training and instructions, Works has admitted in her depositions that her performance stuttered from the very beginning of her time at the SSA. *See* Pl. Dep. I 26:9; *see also* Def.'s Mot. for Summ. J. Ex. 19-C, at 137:13-21. Plaintiff struggled to complete several projects satisfactorily, and other employees frequently had to step in and finish the projects when Plaintiff failed to do so. *See* Def.'s Mot. for Summ. J. Ex. 19-B, 22:3, ECF No. 64-20 (Transcript of Hearing before Administrative Law Judge, Aug. 19, 2006) (Team Leader Yvonne Curry ("Curry") describing one project assigned to Works as "a simple task that . . . was poorly done[.]"); *see also* Warner Aff. 3 (describing a project that Johnson-Bey assigned to Works that she failed to complete, requiring another employee to do so).

In addition to Works's struggles to complete the assigned projects, her supervisors also noted concerns regarding her conduct in the workplace. Specifically, she was observed socializing frequently, using her telephone for personal reasons, and spending a considerable

---

[2] Janet Edrington joined as a Deputy Branch Chief in May 2003. Edrington Dep. 9:3, March 27, 2014, ECF No. 64-16.

amount of time away from her desk. Def.'s Mot. for Summ. J. Ex. 19-C, at 112:23; *see also* Def.'s Mot. for Summ. J. Ex. 19-B, at 39:15-40:13 (in which Curry expressed her concern that Works was often away from her workstation and talking on the telephone for non-work matters, among other issues). All of Works's supervisors did not share these concerns, as Noma Carter ("Carter"), another Team Leader, testified that Works "did not socialize at the workplace any more than other employees." Carter Aff. 1, ECF No. 72-35. Plaintiff also fell asleep in several meetings, and made frequent mistakes when completing her timesheets. Pl. Dep. I 113:6-14, 115:21. Throughout the first few months of her employment, Works knew that her performance had not entirely impressed her superiors. Def.'s Mot. for Summ. J. Ex. 24, ECF No. 64-25 (Doctor's Progress Report, Dec. 16, 2002) (Works admitted that her "supervisors are unhappy with her work.").

### C. January – February 2003: Plaintiff's Seizures and Related Leave Requests

Beginning in late December 2002, Works's VA doctors introduced new medications into Works's treatment program. Pl. Dep. I 50:10. Although the new medications did not initially cause her problems, Works suffered a seizure in early January 2003. Pl. Dep. I 50:21; Def.'s Mot. for Summ. J. Ex. 19-A, at 90:13. Works's doctors advised that she would be unable to work from January 7-20, 2003, but she had not yet accrued the necessary sick leave. Def.'s Mot. for Summ. J. Ex. 25, ECF No. 64-26 (Plaintiff's Memorandum to Warner, Jan. 23, 2003); Pl. Dep. II 160:2. Plaintiff thus requested advance sick leave from Warner, who immediately approved her request. *See* Def.'s Mot. for Summ. J. Ex. 25 (denoting

6

Warner's approval on Jan. 24, 2003); *see also* Pl. Dep. II 160:5. Plaintiff never requested any additional accommodations. Pl. Aff., May 31, 2005, ECF No. 64-29.

Works's doctors cleared her to return to work with no restrictions on January 20, 2003. Unfortunately, she suffered a grand mal seizure at work on February 13, 2003. Pl. Aff. 3, May 30, 2004, ECF No. 64-30. Works thus was absent from work from February 13-21, using annual leave approved by Warner. Pl. Dep. III 169:23-170:11; Def.'s Mot. for Summ. J. Ex. 31, 7, ECF No. 64-32 (Works's "Application for Leave"). To help facilitate Works's return to a safe work environment, Warner and Johnson-Bey engaged a SSA nurse to teach staff how to render aid in the event that Works suffered another seizure in the workplace. Def.'s Mot. for Summ. J. Ex. 19-C, at 79:20-80:3; Johnson-Bey Aff. 2-3, ECF No. 64-23; Warner Dep. 342:3-5, March 24, 2014, ECF No. 64-14.

Works's doctors again cleared her to work with no restrictions on February 24, 2003. Def.'s Mot. for Summ. J. Ex. 32, ECF No. 64-33 (Letter from VA Neurology Service). Plaintiff, however, did not return to work on February 24, as she had already scheduled a non-seizure related appointment for that day. Def.'s Mot. for Summ. J. Ex. 33, ECF No. 64-34 (notice of cancellation of the non-seizure related appointment); Def.'s Mot. for Summ. J. Ex. 19-A, at 187:23-188:2. She was unable to attend the appointment due to slipping on ice, and she again did not return to work on the following day. Def.'s Mot. for Summ. J. Ex. 19-A, at 187:23-188:2. As Works initially failed to provide documentation for her unexplained absences, Warner was forced to place her absent without leave status. *See* Def.'s Mot. for Summ. J. Ex. 19-C, at 88:16-91:16. Once Works provided documentation for her seizure-

7

related absence, Warner changed Works's status to leave without pay.[3] Def.'s Mot. for Summ. J. Ex. 19-A, at 267:9. Works failed to provide documentation for her absences on February 24-25, thus her status for those days remained absent without leave. *See* Def.'s Mot for Summ. J. Ex. 19-A, at 439:24-440:4; *see also* Def.'s Mot. for Summ. J. Ex. 19-C, 81:10-82:10, 94:5.

### D. March – May 2003: Plaintiff's Performance and Evaluation

As a probationary employee, Works received a mid-year performance review to advise her as to the likelihood of the SSA retaining her beyond her trial year. Warner thus solicited evaluations from team leaders working with Plaintiff. Def.'s Mot. for Summ. J. Ex. 19-C, at 96:13-24. Although a few team leaders, such as Carter, gave Works satisfactory reviews, the team leaders generally told Warner that Works's performance was "not acceptable," as she "had trouble completing virtually every assignment . . . given her." *Id.* Johnson-Bey met with Plaintiff on March 19, 2003 to inform her of the concerns, explaining that her performance was "basically satisfactory," but that she needed to improve. Def.'s Mot. for Summ. J. Ex. 19-A, at 377:15; Def.'s Mot. for Summ. J. Ex. 36, ECF No. 64-37 (June 23, 2003 Probationary Period Performance Review describing Plaintiff's March 2003 review).

Far from improving after this warning, Plaintiff's performance instead continued to deteriorate. Over the next several months, Works struggled to complete assignments in a

---

[3] Works did not have sufficient accrued leave, therefore Warner's only choice was to place Works on leave without pay. Def.'s Mot. for Summ. J. Ex. 19-C, at 88:18-91:16.

satisfactory manner. *See, e.g.*, Def.'s Mot. for Summ. J. Ex. 19-C, at 100:4-101:9. For example, Works claimed that she had performed a substantial portion of a project with a fellow employee, George Frank ("Frank"). *See id.*; Warner Dep. 132:4-135:12, 137:3-5. When Works's supervisors pressed her for more details, they quickly realized that she had vastly overstated her participation. *See* Def.'s Mot. for Summ. J. Ex. 19-C, at 100:4-101:9; Warner Dep. 132:4-135:12, 137:2-5. Frank later reported to Warner and Johnson-Bey that Plaintiff's work was minimal, as she was "more of a hindrance than [a] help[]."[4] Def.'s Mot. for Summ. J. Ex. 19-C, at 31:10, 100:21. Works also refused to complete typing pool assignments, a duty of all management assistants, *See id.*, at 105:15, 273:7; 292:9. Even further, Works inaccurately completed a data assignment for Johnson-Bey, among other mistakes. Def.'s Mot. for Summ. J. Ex. 36, at 2; Johnson-Bey Dep. 219:19-223:10, Jan. 17, 2014, ECF No. 64-24. Johnson-Bey did not learn of these mistakes until he used the data in a presentation before other SSA employees. Pl. Dep. III 136:15-137:19.

Not only did Works's performance not improve, but she also continued to take numerous days of leave. *See* Def.'s Mot. for Summ. J. Ex. 38, ECF No. 64-39 (Plaintiff's Leave Record). This leave was largely unrelated to her seizure disorder, instead connected to sinus problems or housing issues. Pl. Dep. III 159:18-94:23.

### E.  Plaintiff's Termination

---

[4] Works admitted that she had disagreements with Frank regarding a work assignment. Pl. Dep. I 91:20. In a more recent deposition, however, she denied any such disagreement. Pl. Dep. III 128:10-25. Similarly, despite his earlier statements regarding his frustration with Works's effort, Franks recently said that he could not remember any disagreements. Frank Dep. 27:13-28:2, Jan. 9, 2014, ECF No. 64-38.

On June 23, 2003, Johnson-Bey gave Plaintiff a letter expressing her supervisors' increasing concerns regarding her performance. Def.'s Mot. for Summ. J. Ex. 36, at 1. Specifically, the letter explained to Works that her "performance and conduct ha[d] considerably deteriorated since the [March 2003] performance discussion," and that "substantial improvement [wa]s needed." *Id.* at 2. A few weeks later, Works asked Warner if she would be retained after her probationary period. Def.'s Mot. for Summ. J. Ex. 19-C, at 118:2-4. Warner replied that, as Works's performance had not improved since the June 2003 warning letter, she would likely not be retained. *Id.* at 118:4-7. Warner then asked human resources employees to draft a termination notice for Works. *Id.* at 118:12-16.

In an effort to change Warner's and Johnson-Bey's minds regarding her termination, Works asked to meet with them on July 25, 2003. *See id.* at 118:19-118:23. At this meeting, Plaintiff presented Warner, Johnson-Bey, and Edrington with a banker box of paper that she claimed was a printout of a database that she had coded. *See id.*; *see also* Edrington Dep. 47:8-50:4. Works's supervisors soon discovered, however, that the contents were merely two pages of computer code that had been photocopied over and over to create the impression that the box contained pages of computer code, written by Works. Edrington Dep. 47:8-50:4; *see also* Def.'s Mot. for Summ. J. Ex. 39, ECF No. 64-40 (the two pages of computer code from the above incident). When Warner and Edrington questioned Works, she burst into tears and explained that she was experiencing personal problems. Def.'s Mot. for Summ. J. Ex. 19-C, at 119:23-25; Pl. Dep. III 157:21-25, 155:9-157:15 (in which Plaintiff admitted to the banker box incident). Works received a notice of proposed removal later

that day, with termination effective August 8, 2003. Def.'s Mot. for Summ. J. Ex. 40, ECF No. 64-41 (Notice of Termination).

On July 28, 2003, Works asked Warner to reassign her to a different position within the SSA. Def.'s Mot. for Summ. J. Ex. 19-C, at 132:9-16. As Warner did not have the authority to grant such a request, she recommended that Works ask Joan Stewart-Stevens ("Stewart-Stevens"), the Assistant Associate Commissioner for the SSA Management Operations Center. *Id.* Works did so, and Stewart-Stevens consequently convened a meeting of Warner, Johnson-Bey, and several team leaders with whom Plaintiff had worked. *See id.* at 133:5-24, 402:5-403:22. At this meeting, each participant expressed observations of Works's performance. *See* Def.'s Mot. for Summ. J. Ex. 19-C, at 402:5-403:22; *see also* Def.'s Mot. for Summ. J. Ex. 41, 1-2, ECF No. 64-42 (Warner's notes from the Stewart-Stevens meeting). For example, one participant, Jane Leidig, explained that she refrained from assigning any "complex" projects to Works, as she "wouldn't expect to get it completed." Def.'s Mot. for Summ. J. Ex. 41, at 2. Other team leaders echoed her concerns.[5] *See id.* at 1-2. Stewart-Stevens thus determined that Works would not be reassigned. Def.'s Mot. for Summ. J. Ex. 19-C, at 403:4-5.

## F.  Proceedings Before This Court

Plaintiff filed the subject action in this Court on May 21, 2010, after the Equal Employment Opportunity Commission ("EEOC") affirmed an administrative law judge's

---

[5] Noma Carter was not at the meeting, but Johnson-Bey met with her individually at Warner's request. *See* Def.'s Mot. for Summ. J. Ex. 41, at 3. Carter reported that some of Plaintiff's work was satisfactory, but that she thought Plaintiff was better-suited for a lower-level position. *Id.*

conclusion that the SSA did not discriminate against Works when it terminated her in July 2003. *See generally* Compl. This Court then granted summary judgment in favor of Defendant SSA on all counts, and denied Works's request for further discovery. Mem. Op., ECF No. 27; Order, ECF No. 28. Specifically, this Court granted judgment as a matter of law in favor of the SSA on Works's claims of disability discrimination, failure to accommodate, and retaliation, and dismissed all other claims for failure to exhaust administrative remedies. After this Court denied Plaintiff's Motion for Reconsideration (ECF No. 32), Plaintiff appealed to the United States Court of Appeals for the Fourth Circuit. The Fourth Circuit, noting that Works disputed only her disability discrimination, failure to accommodate, and retaliation claims, vacated this Court's order. *Works*, 519 F. App'x at 181 n.8. Reasoning that discovery could help shed light on Plaintiff's remaining claims, the Fourth Circuit remanded Works's case to this Court for that purpose. *Id.* at 177. After the parties conducted extensive discovery, Defendant SSA moved for summary judgment on all remaining claims. Def.'s Mot. for Summ. J., ECF No. 64. In response, Works contends that genuine issues of material fact remain, such that she is entitled to a jury trial. Pl.'s Resp. in Opp. to Def.'s Mot. for Summ. J., ECF No. 72.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  A

material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249.

In undertaking this inquiry, this Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, this Court must also abide by its affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993). If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment must be granted. *Anderson*, 477 U.S. at 249-50. On the other hand, a party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999). This Court has previously explained that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citations omitted).

<u>ANALYSIS</u>

**A. Disability Discrimination (Count I)**

13

In her first claim, Plaintiff contends that Defendant discriminated against her on the basis of her disability, in violation of the Rehabilitation Act. A claim of disability discrimination under the Rehabilitation Act must undergo the same analysis as a similar claim under the Americans with Disabilities Act ("ADA"). *See Hooven-Lewis v. Caldera*, 249 F.3d 259, 268 (4th Cir. 2001). A plaintiff must establish that she (1) is a "qualified individual with a disability;" (2) was "discharged;" (3) was "fulfilling [her] employer's legitimate expectations at the time of discharge; and (4) the "circumstances of [her] discharge raise a reasonable inference of unlawful discrimination." *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 150 (4th Cir. 2012) (quoting *Rohan v. Networks Presentations LLC*, 375 F.3d 266, 273 n.9 (4th Cir. 2004) (internal quotation marks omitted)). Works must satisfy each of the above elements to survive summary judgment, but her claim falters at the first element.

A "qualified individual" under the ADA, and thus the Rehabilitation Act, must demonstrate that she is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position" at issue. *Tyndall v. Nat'l Educ. Centers, Inc. of California*, 31 F.3d 209, 212-13 (4th Cir. 1994) (quoting 42 U.S.C. § 1211(8)). A "qualified" person thus "must be able to meet all of a program's requirements in spite of his handicap." *Tyndall*, 31 F.3d at 213 (quoting *Southeastern Community College v. Davis*, 442 U.S. 397, 406 (1979) (internal quotation marks omitted)). The burden is on the plaintiff to prove that she can perform the essential functions, and if not, that a "reasonable accommodation by the employer would enable [her] to perform those functions." *Tyndall*, 31 F.3d at 213 (quoting *Chandler v. City of Dallas*, 2 F.3d 1385, 1393-94

14

(5th Cir. 1993)).

Works contends that she was qualified for her position because she received satisfactory performance evaluations on some of her projects at the SSA. In particular, Works points to her March 2003 review and Carter's assessment of Works's abilities as evidence that a clear issue of fact remains as to her performance. *See* Mem. in Supp. of Pl.'s Resp. in Opp. to Def.'s Mot. for Summ. J., 19, ECF No. 72-3. Yet, the record is also replete with reports of Plaintiff's struggling performance. *See, e.g.*, Def.'s Mot. for Summ. J. Ex. 36, at 1-2. Although the poor reviews of Works's performance, in sheer volume, may outweigh the positive reviews, a reasonable jury could find in favor of the Plaintiff on this issue. The presence of some positive reviews thereby precludes this Court from concluding that no genuine dispute of material fact remains as to performance.

A finding of genuine issue of material fact as to Works's performance, however, does not end this inquiry. An employee must "possess[] the skills necessary" for the relevant position, but also must be "willing and able to demonstrate these skills by coming to work on a regular basis." *Tyndall*, 31 F.3d at 213. Unless an employee can work capably from home, an employee "who does not come to work cannot perform *any* of his job functions, essential or otherwise." *Id.* (quoting *Wimbley v. Bolger*, 642 F. Supp. 481, 485 (W.D. Tenn. 1986), *aff'd* 831 F.2d 298 (6th Cir. 1987)). Thus, when a "regular and reliable level of attendance is a necessary element" of the position at issue, an employee's frequent absences prevent her from performing the essential functions of that job. *Tyndall*, 31 F.3d at 213. Such an employee is not a "qualified individual" within the meaning of the ADA. *Id.*; *see also Carr*

15

*v. Reno*, 23 F.3d 525, 529-30 (D.C. Cir. 1994) (concluding that regular attendance is an "essential function" for purposes of the ADA).

In this case, Works held a job that could not be performed away from the SSA offices. As a management assistant, she was required to maintain and compile data related to the Employee Development and Training Branch, create and understand graphs of the relevant data, maintain certain databases, and generally assist her superiors at the EDTB. Def.'s Mot. for Summ. J. Ex. 14, at 1 (Position Description). Such tasks required that an employee be physically at the SSA, not at home. Yet, far from attending work regularly, Works took over 300 hours of leave, amounting to more than seven weeks, in less than a twelve-month period. Def.'s Mot. for Summ. J. Exs. 31, 38. The SSA granted each of Works's leave requests, but these accommodations did not improve her attendance record. Instead, she continued to request, and receive, leave. Moreover, much of Works's leave was unrelated to her seizure disability. For example, she missed work for non-seizure medical appointments, housing issues, and personal issues, among other unrelated reasons. *See* Pl. Dep. I. 159:18-194:17. Like the plaintiff in *Tyndall*, Work's excessive absenteeism, whether related or unrelated to her seizure disorder, prevented her from performing the essential obligations of her position. *See* 31 F.3d at 213-14. She thus is not a "qualified individual," as required by the ADA.

In sum, Works must satisfy each element of a prima facie case of disability discrimination to survive summary judgment. Although a reasonable jury could find that her performance, when she was actually at work, was satisfactory, Plaintiff's numerous days of

leave prevented her from fulfilling the essential functions of her position. As she is not a "qualified individual," the SSA is entitled to judgment as a matter of law on Works's claim of disability discrimination under the Rehabilitation Act (Count I).

### B. Failure to Accommodate (Count II)

In moving for summary judgment, the SSA contends that, even after extensive discovery, Works has failed to raise any genuine issue of material fact as to Defendant's alleged failure to accommodate her disability. A prima facie case of failure to accommodate under the Rehabilitation Act requires a plaintiff to establish: (1) she was an individual with a disability within the meaning of the ADA; (2) the employer had notice of her disability; (3) she could perform the essential functions of the position with reasonable accommodation; and (4) the employer refused to make such accommodations. *Rhoads v. FDIC*, 257 F.3d 373, 387 n.11 (4th Cir. 2001). The notice requirement of the second prong is "not an onerous [burden]," but an employee must inform the employer of her disability *and* her need for reasonable accommodations for that disability. *Schneider v. Giant of Maryland, LLC*, 389 F. App'x 263, 270 (4th Cir. 2010) (citing *E.E.O.C. v. Federal Express Corp.*, 513 F.3d 360, 369 (4th Cir. 2008)). Further, the requested accommodation may not "impose an undue hardship on the operation of [the employer's] program[.]" 45 C.F.R. § 84.12(a).

Once again, Plaintiff cannot establish the prima facie elements of an accommodation claim under the Rehabilitation Act. Neither party disputes that Works, with her severe seizure disorder, is an individual within the meaning of the ADA. The remaining elements,

17

however, are not so easily satisfied. First, for the reasons discussed in the foregoing section, Works could not perform the essential functions of her position with the requested accommodation. Second, the record clearly reveals that the SSA granted each of Works's disability-related requests for leave. *See* Def.'s Mot. for Summ. J., Exs. 31, 38.

Finally, Works fails to demonstrate that her employer, the SSA, had notice of her disability within the meaning of the Rehabilitation Act. Her supervisors' awareness of her disability is certainly well-documented. Warner, for example, testified that she remembered an instance in which Works suffered a seizure while at work. Pl.'s Resp. in Opp. to Mot. for Summ. J., Ex. 5, 79, ECF No. 72-9. Johnson-Bey also acknowledged that Works suffered from seizures due to a workplace fall. Johnson-Bey Dep. 307:20-22, 309:1-2, Jan. 17, 2014, ECF No. 72-31. Yet, in granting all of the leave Works requested,[6] the SSA never received any notice that she required additional disability-related leave. If she required further leave, she never submitted any such requests.[7] Since Plaintiff cannot establish a prima facie case of Defendant's failure to accommodate her disability under the Rehabilitation Act, the SSA is entitled to judgment as a matter of law on Count II of the subject Complaint.

## C. Retaliation (Count III)

---

[6] Works originally argued that her request for reassignment to a part-time, less stressful position was a reasonable accommodation denied by Defendant. This request is irrelevant for two reasons. First, Works fails to mention the reassignment request in her Response to Defendant's Motion for Summary Judgment. Instead, she discusses only her requested leave. Second, Works made this request *after* she received the notice of termination. An employer, however, has no duty to accommodate an employee after such notice is given. *See Scott v. Memorial Sloan-Kettering Cancer Center*, 190 F. Supp. 2d 590, 595 (S.D.N.Y. 2002).

[7] As she argued in her Opposition to Defendant's first Motion for Summary Judgment (ECF No. 18-2), Works contends that any accommodation granted by the SSA is meaningless because the SSA then used that accommodation as a basis for her termination. Mem. in Supp. of Pl.'s Opp. to Mot. for Summ. J., at 39-40. This Court again notes that this argument is properly considered under Plaintiff's claim of retaliation.

To prevail on a retaliation claim under the Rehabilitation Act, Works must establish (1) she engaged in protected activity; (2) the SSA took adverse employment action against her; and (3) the protected activity was causally connected to the adverse action. *Hooven-Lewis*, 249 F.3d at 272-74. If the SSA offers a legitimate, non-discriminatory reason for the adverse employment action, then Works must prove that the proffered reason is merely pretextual. *Id.*; *see also Brockman v. Snow*, 217 F. App'x 201, 207, 208 n.6 (4th Cir. 2007).

Works satisfies the elements of a prima facie case. First, this Court will assume, and neither party disputes, that her requests for leave constituted protected activity under the Rehabilitation Act. Second, Works's termination on July 25, 2003 is nothing if not an adverse employment action. Third, she demonstrates a sufficient "causal nexus" for prima facie purposes. *Brockman*, 217 F. App'x at 207. As the Fourth Circuit has explained, an "employee need not *prove* causation itself" when establishing a prima facie case. *Id.* (emphasis added). Rather a "close temporal proximity between the protected activity and the adverse action is sufficient to show a causal nexus." *Id.* (citing *Yashenko v. Harrah's N.C. Casino Co.*, 446 F.3d 541, 551 (4th Cir. 2006)). Here, Works points to the leave she requested, and for which she received the SSA's approval, related to seizures she suffered on July 15 and 16, 2003. She argues that the temporal proximity between this leave and her termination later that month are sufficient to establish the requisite causal connection. *See Brockman*, 217 F. App'x at 207. At the prima facie stage, this temporal relationship adequately establishes the third element of an accommodation claim.

Works's claim falters, however, by failing to rebut the SSA's proffered legitimate,

19

non-discriminatory reasons for termination as pretextual. Works's notice of termination listed two reasons for her termination: (1) failure to complete assignments as expected by her supervisors; and (2) frequent absence from work due to unscheduled leave. Def.'s Mot. for Summ. J. Ex. 40. Works contends that these motivations for firing her are Defendant's concerted attempt to mask its true motivation – penalizing her for her use of disability-related leave. She points to an alleged shift in Defendant's reasons for termination as proof that she was fired in retaliation for her protected activity. Mem. in Supp. of Pl.'s Opp. to Def.'s Mot. for Summ. J., at 41-42.

Yet, the record does not support Works's contention. First, her performance issues are well-documented, as she evidently struggled with the tasks associated with her position. *See* Def.'s Mot. for Summ. J. Exs. 40, 41. Warner's assertion that Works's termination was largely due to performance issues is not undermined by the Notice of Termination's reference to Works's socializing and personal telephone calls. The SSA explained that these specific conduct issues, plus Works's below-expectation professional skills, made her unsuitable for a permanent position. *See* Def.'s Mot. for Summ. J. Ex. 36 (the June 2003 Probationary Period Performance Review warning Works of her negative evaluations). Even if Carter testified that Works did not socialize more than other employees, this conduct only exasperated Works's existing performance issues.

Second, there is no evidence in the record that the SSA's second proffered reason for termination – Works's frequent use of unscheduled leave – is pretext for retaliation. The SSA, far from penalizing Works due to her use of leave, granted every request for disability-

related leave. When Works suffered seizures in January and February 2003 and took related leave, she still received a satisfactory review in March 2003. Works offers no evidence to explain why the SSA would retaliate against Works for leave taken in July 2003, when it had not done in January or February 2003. Moreover, after each occasion in which Works took her requested (and granted) leave, the SSA welcomed her return. Johnson-Bey, for example, met with Works to discuss the steps the SSA should take in the event that Works had a seizure in the workplace. The SSA advised Works that her performance was unacceptable, and gave her ample opportunities to improve. It was only when her performance continued at the same unacceptable level that the SSA took action. Works's frequent use of leave, both related and unrelated to her disability, prevented her from fulfilling even the basic obligations of her position.

On the basis of the record, Defendant's proffered reasons for Works's termination are thus legitimate and non-discriminatory. Works establishes a prima facie case of retaliation, but cannot rebut the SSA's non-discriminatory explanation as merely pretextual. The SSA is thus entitled to judgment as a matter of law on Count III.

<u>CONCLUSION</u>

For the reasons stated above, Defendant Social Security Administration's Motion for Summary Judgment (ECF No. 64) is GRANTED, Judgment is entered in its favor, and this

case is to be CLOSED.

A separate Order follows.

Dated: February 20, 2015

_____/s/_____
Richard D. Bennett
United States District Judge